NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| GUILIO MESADIEU, | : | Civil Action No. 18-842 (JMV/JBC) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CITY OF ELIZABETH, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**VAZQUEZ, District Judge:**

## I.    INTRODUCTION

Plaintiff Guilio Mesadieu, proceeding *pro se*, seeks to bring a federal civil rights complaint. (DE 1.)   At this time,[1] the Court reviews Mesadieu's complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), to determine whether it should be dismissed as frivolous or malicious, for failure to state a claim upon which relief may be granted, or because it seeks monetary relief from a defendant who is immune from such relief.

For the reasons set forth below, Mesadieu's 42 U.S.C. § 1983 unlawful search claim against police officer Jose Martinez, and that claim alone, is now permitted to proceed past screening. The Court will dismiss, with prejudice, Mesadieu's 42 U.S.C. § 1985(1) and 42 U.S.C. § 1985(2) civil conspiracy claims as against all defendants.   Any and all such federal civil rights claims which Mesadieu asserts against the Elizabeth Police Department as a standalone municipal entity

---

[1]   The Court previously granted Mr. Mesadieu leave to proceed *in forma pauperis* and ordered the Clerk of the Court to file his Complaint.   (DE 3.)

are also dismissed with prejudice.   All other claims in Mesadieu's pleading are dismissed without prejudice.

## II.    BACKGROUND

The present civil action arises out of the purportedly unlawful actions committed on – and otherwise associated with – Mesadieu's February 9, 2016 arrest by members of the Elizabeth Police Department ("EPD").   Mesadieu's Complaint names the following defendants: (1) City of Elizabeth;[2] (2) Union County; (3) EPD Chief of Police Patrick Shannon; (4) EPD Detective Frammigen; (5) EPD Lieutenant Robert Kelly; (6) EPD Sergeant Todd Kelly; (7) EPD Sergeant Rodney Dorilus; (8) EPD Officer Jose Martinez; (9) EPD Officer Raul Delaprida; (10) EPD Officer Guillermo Valladares; (11) EPD Officer Kevin Kelly; (12) EPD Officer Jose Torres; (13) EPD Officer Rui Xavier; (14) Luis Figueiredo; (15) Union County Prosecutor Grace H. Park; (16) Assistant Attorney General ("AAG") Daniel Ian Bornstein; (17) Union County ("UC") Sheriff's Officer Timothy O'Grady; (18) UC Sheriff's Officer Bryan Frew; (19) Bergen County Prosecutor's Office ("BCPO") Detective James Eckert (20) BCPO Detective Ismael Alsina; and (21) John Does 1-60.   (DE 1 at 1-2, 5-12.[3])

---

[2]  In addition to the City of Elizabeth, Mesadieu also formally lists EPD as a standalone defendant. (DE 1 at 1.)   A police department, however, is not a distinct municipal entity that may be sued for alleged civil rights violations.   *See Jackson v. City of Erie Police Dep't*, 570 F. App'x 112, 114 n.2 (3d Cir. 2014) ("Although local governmental units may constitute 'persons' against whom suit may be lodged under 42 U.S.C. § 1983, a city police department is a governmental sub-unit that is not distinct from the municipality of which it is a part.").   The Court will therefore terminate EPD as a standalone party and dismiss with prejudice all federal civil rights claims asserted against EPD.   In addition, Mesadieu's limited specific factual allegations against EPD are that it "employs defendants" and that it is – like the City of Elizabeth – the "workplace for defendants."   (*See* DE 1 at 5.)   Moreover, while Mesadieu repeatedly asserts that the City of Elizabeth, specifically, is liable to him under numerous theories of supervisory liability (*see id.* at 20-29), his complaint makes no further references to EPD.

[3]   Page citations within DE 1 refer to the official docket "PageID:" number.

The specific factual allegations in Mesadieu's Complaint, which the Court assumes as true for present screening purposes, are as follows. On the morning of February 9, 2016, otherwise unidentified "Elizabeth Police defendants initiated an unlawful motor vehicle stop of [Mesadieu's] company vehicle on his way to work." (*Id.* at 13.) Mesadieu "did not commit any traffic violations" and these "defendants [instead] falsely and willfully issued multiple falsified motor vehicle citations [to justify that stop]." (*Id.* at 16.)

After Mesadieu's "vehicle was in park, [he] grabbed his credentials and was holding them up in both hands." (*Id.* at 13.) EPD officers nonetheless "approached his vehicle, banging and hitting the passenger side . . . while making hysterical noises." (*Id.*) In addition, "Defendant Kelly[4] pointed a gun at [Mesadieu's] head and threaten[ed] to kill [him]." (*Id.*) After EPD officers removed Mesadieu "from his vehicle[, they] commenced an illegal search [of it]." (*Id.* at 14.) Officer Jose Martinez also searched Mesadieu's person, during which time he removed $4,900 from Mesadieu's jacket.[5] When Mesadieu refused to sign a "consent to search form" that Martinez presented to him "after defendants . . . violated [his] constitutional rights," Mesadieu was placed in an EPD vehicle. (*Id.*) Ultimately, "the illegal search [of Mesadieu's person and vehicle] did not lead to the discovery of any contraband, [and] defendants [therefore] falsely, willfully, and unlawfully charged [him] with possession of a handgun and certain person not to possess weapon."[6] (*Id.* at 15.)

---

[4]   Because there are three named defendants whose last name is Kelly, it is unclear which "Defendant Kelly" Mesadieu is referring to.

[5]   Mesadieu does not further elaborate on what ultimately happened to this money. Mesadieu does not specifically allege that Martinez – or any other member of the EPD – improperly kept that money; he claims only that $4,900.00 in cash was taken in the course of Martinez's search of Mesadieu's person.

[6]   The Court notes that publicly available New Jersey Department of Corrections ("DOC") offender records, obtained from www20.state.nj.us/DOC_Inmate/inmatesearch, indicate that

Mesadieu was then transported to EPD headquarters. Upon arriving there, otherwise unidentified defendants "ridicule[d Mesadieu] by saying 'we're setting you up' and . . . chanting 'Donald Trump.'" (*Id.* at 14.) Mesadieu was then, at his request, taken to EPD's internal affairs ("IA") office, where he was formally arrested. (*Id.* at 15.) Mesadieu's February 9, 2016 arrest occurred notwithstanding that "defendants confessed in front of [non-defendant, IA Detective Moloney] that they were setting [Mesadieu] up with a gun." (*Id.*) This arrest allowed unidentified BPD officers to "cover up their misconduct and corruptions." (*Id.*; *see also id.* at 17.) Moreover, but for the defendants' falsification of evidence and willful refusal to produce certain "exculpatory information," *e.g.*, otherwise unspecified "video recording evidence" and information about his IA appearance on February 9, 2016, Mesadieu "would have been able to prove[] his innocence." (*Id.* at 18.) The actions taken by defendants to cover-up their misconduct and withhold exculpatory evidence were committed in conjunction with a "code of silence" policy among all defendants. (*Id.* at 17.)

Mesadieu believes that the foregoing actions were motivated by his refusal to become a confidential informant ("CI"). In that respect, he specifically notes that "prior to [his] unlawful arrest [on February 9, 2016, he] was interviewed by the Union County Prosecutor's detectives[,]" who, at that time,[7] delivered an ultimatum: Mesadieu could either become a [CI] for Union County

---

Mesadieu was, on June 8, 2018, convicted of unlawfully possessing a handgun on February 9, 2016, as well as for a related "certain persons to not to have weapons" offense that was also committed on February 9th, *i.e.*, the date on which Mesadieu claims that he was unlawfully arrested and framed by the EPD. This information undermines – but does not unequivocally refute – Mesadieu's claim that he was unlawfully charged with possession of a handgun and certain persons not to possess weapon offenses in the wake of his February 9th arrest.

[7]  It is unclear from Mesadieu's pleading whether this interview occurred on February 9, 2016, or at some date prior. (*See* DE 1 at 16 (simultaneously noting that this interview occurred after he was "wrongfully charge[d] for guns" and that "[t]he Union County detective [took Mesadieu] out of Union County Jail on or about [December 19, 2014] and gave [him the] ultimatum").)

and [EPD]" or be sent "to prison for the false charges which [he is] currently [incarcerated]." (*Id.* at 16.) Mesadieu's arrest occurred after he "refused the ultimatum." (*Id.* at 16.) While Mesadieu relatedly claims that Prosecutor Park and AAG Bornstein were also involved in his "wrongful[] imprison[ment] for [his] refusal [to become] a confidential informant" (*see id.* at 19), he does not detail any personal interactions that he had with either defendant or any overt actions taken by Park and Bornstein which might otherwise provide factual support for this allegation.

Mesadieu alleges that the foregoing actions violated rights secured to him by the United States Constitution. He specifically claims that his unlawful arrest and illegal search and seizure violated the Fourth Amendment. (*Id.* at 17-18.) He further claims that the "officer defendants . . . , in targeting [Mesadieu] based on corruption, denied him equal protection of the law, in violation of the . . Fourteenth Amendment." (*Id.* at 25.) He likewise claims that these otherwise unspecified defendants, "in writing falsified traffic citations and police report[s] base[d] on corruption constituted selective enforcement of law in violation of the Fourteenth Amendment." (*Id.* at 26.) Mesadieu adds that the defendants, "in conspiring to target, arrest, unlawfully seiz[e], and falsify[] police report[s,]" violated 42 U.S.C. §§ 1983, 1985(3),[8] and 1986. (*Id.* at 26-27.) He also specifically alleges that the defendants conspired to deny him access to the exculpatory evidence detailed above, and that their conspiratorial actions have denied him his constitutional

---

[8] Mesadieu also asserts entitlement to relief under 42 U.S.C. §§ 1985(1) and (2). (*See* DE 1 at 27.) It is clear, however, based on the plain language of the statute, that those specific provisions are inapplicable to his case. *See* 42 U.S.C. § 1985(1) (providing a cause of action where "two or more persons . . . conspire to[, *inter alia*,] prevent . . . any person from accepting or holding any office, truest, or place of confidence under the United States, or from discharging any duties thereof" or "impede [an office holder] in the discharge of his official duties"); *id.* at § 1985(2) (providing a cause of action where "two or more persons . . . conspire to[, *inter alia*] deter . . . any party of witness in any court of the United States from attending such court, [or serving as a juror,] or from testifying to any matter pending therein"). Mesadieu's §§ 1985(1) and (2) claims are accordingly dismissed with prejudice.

right of access to the Courts. (*Id.* at 19, 20, 27.) Mesadieu also asserts state tort claims for assault, wrongful imprisonment, corrupt misconduct, intentional infliction of emotional distress, and negligence against various named defendants. (*Id.* at 28-29.)

Mesadieu further claims that Prosecutor Park, AAG Borstein, EPD Police Chief Shannon, Elizabeth, and Union County "are directly liable for [his] damages" under numerous theories of supervisory liability. (*Id.* at 17, 21-24.) He claims that the above-named defendants' failure to properly supervise defendants has resulted in a "well settled and permanent policy" in which prosecutors and police officers are allowed to "wrongfully arrest individuals" and to "forc[e] them to become [CIs]." (*Id.* at 21.) He avers that all of these defendants "are under a duty to supervise the members of the [EPD] and to ensure that the policing activities of the [EPD] are run in a lawful manner" and that they "permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice, or custom of police officers, and prosecutors, including but not limited to defendants, of violating [Mesadieu's] rights based on corruptions." (*Id.* at 20-21.) He claims that "[t]hese defendants failed to train and properly supervise police officers regarding proper arrest procedures and techniques." (*Id.* at 22.) Mesadieu further avers that these five defendants are all responsible for "policies or customs of inadequate training, supervision, discipline, screening, or hiring." (*Id.*)

Mesadieu similarly claims that Prosecutor Park "has a supervisory role over the assistant prosecutor, prosecutor detective defendants and the [EPD] officer defendants[,]" and that she "has been place[d] on notice of the misconduct of her subordinates by a number of complaints of the unlawful practice, pattern or custom of her subordinates in molding and/or blackmailing the citizens of Union County or others, and forcing them [to] becom[e CIs] . . . and has failed to act to curb this behavior or otherwise correct the constitutional violations." (*Id.* at 18.) He also avers

that Park "has a 'code of silence' policy between prosecutors and police whereby prosecutors do not report misconduct of other prosecutor or police, and failed to take the necessary steps to break the 'code of silence.'" (Id. at 19.) Mesadieu similarly alleges that Chief Shannon "chose to abide by the 'code of silence' policy . . . whereby officers would not report misconduct of other officers and [he] failed to take the necessary steps to break the 'code of silence.'" (*Id.* at 17.)

Critically, and as the above summary indicates, Mesadieu's complaint fails to contain any specific allegations, against many of the defendants formally identified in the caption of his Complaint. He instead makes sweeping claims against "all defendants" and/or all "officer defendants." Indeed, Mesadieu's pleading fails to contain any specific references to Robert Kelly, Todd Kelly, Kevin Kelly, Rodney Dorilus, Raul Delaprida, Guillermo Valladares, Jose Torres, Rui Xavier, Luis Figueiredo, Timothy O'Grady, Bryan Frew, James Eckert, Ismael Alsina, or Detective Frammigen, much less allege any factual information which specifically ties any of those named defendants to the incidents, conduct, and harm alleged therein.

## III. STANDARD OF REVIEW

Under the Prison Litigation Reform Act ("PLRA"), district courts must review complaints in civil actions in which a prisoner is proceeding *in forma pauperis, see* 28 U.S.C. § 1915(e)(2)(B), seeks redress against a governmental employee or entity, *see* 28 U.S.C. § 1915A(b), or brings a claim with respect to prison conditions, *see* 42 U.S.C. § 1997e. The PLRA directs district courts to *sua sponte* dismiss any claim that is frivolous, is malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B).

"The legal standard for dismissing a complaint for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) is the same as that for dismissing a complaint pursuant to Federal Rule

of Civil Procedure 12(b)(6)." *Schreane v. Seana*, 506 F. App'x 120, 122 (3d Cir. 2012) (citing *Allah v. Seiverling*, 229 F.3d 220, 223 (3d Cir. 2000)); *Mitchell v. Beard*, 492 F. App'x 230, 232 (3d Cir. 2012) (discussing 42 U.S.C. § 1997e(c)(l)); *Courteau v. United States*, 287 F. App'x. 159, 162 (3d Cir. 2008) (discussing 28 U.S.C. § 1915A(b)). The standard is set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), as explicated by the United States Court of Appeals for the Third Circuit.

To survive the Court's screening for failure to state a claim, the complaint must allege 'sufficient factual matter' to show that the claim is facially plausible. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 n.3 (3d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678). "[A] pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). A complaint may also be dismissed for failure to state a claim if it appears "'that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Haines v. Kerner*, 404 U.S. 519, 521 (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981). *Pro se* pleadings are liberally construed. *See id.* Nevertheless, "*pro se* litigants still must allege sufficient facts in their complaints to support a claim." *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 245 (3d Cir. 2013) (citation omitted).).

## IV.    ANALYSIS

### a.  42 U.S.C. § 1983

A plaintiff may have a cause of action under § 1983 for violations of his constitutional

rights by a state official or employee. The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To obtain § 1983 relief, a plaintiff must establish: (1) that one of his rights secured by the Constitution or laws of the United States was violated; and (2) that this violation was caused or committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988); *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (noting that Section 1983 does not provide substantive rights; rather, it provides a vehicle for vindicating violations of other federal rights).

Moreover, "[o]nly those defendants whose inactions or actions personally caused [a plaintiff's] injur[ies] may be held liable under § 1983." *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1147 (3d Cir. 1990). Stated another way, in order "to prevail in a civil rights action, a plaintiff must demonstrate that the defendant was personally involved in the alleged wrongful conduct; liability cannot be predicated solely on the operation of *respondeat superior*." *Kornegey v. City of Philadelphia*, 299 F. Supp. 3d 675, 680 (E.D. Pa. 2018). Personal involvement can be shown through allegations, made with "appropriate particularity," of personal direction or of actual knowledge and acquiescence. *Id.* at 680 & n.17 (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *accord Iqbal*, 129 S. Ct. at 1948 ("a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

### b. Mesadieu's complaint is dismissed without prejudice as to all Defendants for which no factual allegations were pled

As noted above, Mesadieu's pleading fails to detail any incident or other facts which

specifically tie the noted Defendants, *i.e.*, Robert Kelly, Todd Kelly, Kevin Kelly, Rodney Dorilus, Raul Delaprida, Guillermo Valladares, Jose Torres, Rui Xavier, Luis Figueiredo, Timothy O'Grady, Bryan Frew, James Eckert, Ismael Alsina, or Detective Frammigen, to any of the incidents, conduct, and harm complained of therein.   Because Mesadieu fails to adequately allege that any of these Defendants were personally involved in the wrongful conduct he complains of, any and all such civil rights claims which he purports to assert against these defendants – including under § 1983 – are dismissed without prejudice.   *Iqbal*, 129 S. Ct. at 1948; *Kornegey*, 299 F. Supp. 3d at 680.

### c.   All of Mesadieu's Fourth Amendment-based § 1983 claims, other than his unlawful search claim against EPD Officer Jose Martinez, are dismissed

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable search and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."   U.S. Const. amend IV. As such, "a search or seizure conducted without a warrant or probable cause may form the basis of a § 1983 claim based on the Fourth Amendment."   *Castro v. Perth Amboy Police Dept.*, 2014 WL 229301, at *2 (D.N.J. Jan. 21, 2014) (citing *Reedy v. Evanson,* 615 F.3d 197 (3d Cir. 2010)). Likewise, where law enforcement officers utilize excessive force during an arrest, their actions may violate the Fourth Amendment's prohibition against unreasonable seizures of the person. *Groman v. Township of Manalapan*, 547 F.3d 628, 633 (3d Cir. 1995) (citing *Graham*, 490 U.S. at 394-95).   Here, Mesadieu alleges that various actions of myriad – and often unspecified – EPD officers on February 9, 2016 violated the Fourth Amendment.

Mesadieu first claims that the "Elizabeth Police defendants initiated an unlawful motor vehicle stop of [Mesadieu's] company vehicle on his way to work."   (DE 1 at 13.)   "A traffic

stop is a 'seizure' within the meaning of the Fourth Amendment." *See United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006); *accord Velez v. Fuentes*, No. 15-6939, 2016 WL 4107689, at *3 (D.N.J. July 29, 2016) ("The lawfulness of an initial traffic stop is properly analyzed under the Fourth Amendment.").

"'[A]n officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Illinois v. Wardlow*, 528 U.S. 119, 123. The reasonable suspicion standard – "which is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence" – applies to routine traffic stops. *Delfin-Colina*, 464 F.3d at 396-97 (citations omitted). Thus, the EPD's traffic stop of Mesadieu's vehicle on February 9, 2016 would violate the Fourth Amendment only if the officers that pulled him over did not have a reasonable, articulable suspicion that a violation had occurred. *Id.* at 396.

Here, Mesadieu specifically alleges that he "did not commit any traffic violations" and that "defendants [instead] falsely and willfully issued multiple falsified motor vehicle citations [to justify that stop]." (DE 1 at 16.) Mesadieu has pled sufficient facts which suggest that there was no legitimate basis for the EPD to stop his vehicle. His Complaint, however, fails to identify the specific officers who initially stopped his vehicle. He therefore fails to sufficiently allege the requisite personal involvement of any defendant to allow this claim to proceed past screening. This portion of his Fourth Amendment-based § 1983 claim is therefore dismissed without prejudice as to all defendants. *Iqbal*, 129 S. Ct. at 1948; *Kornegay*, 299 F. Supp. 3d at 680

Mesadieu also takes issue with the actions committed by EPD officers as he sat in his parked vehicle after being pulled over. He specifically alleges that once his "vehicle was in park, [he] grabbed his credentials and was holding them up in both hands." (DE 1 at 13.) Mesadieu

further claims that in spite of this apparently cooperative behavior, EPD officers "approached his vehicle, banging and hitting the passenger side . . . while making hysterical noises" and that a "Defendant Kelly[9] pointed a gun at [his] head and threaten[ed] to kill [him]." (*Id.*) Mesadieu appears to be alleging that the forceful actions of the EPD officers as they approached his vehicle were excessive under the circumstances, and thus, violated the Fourth Amendment.

In considering the merits of this claim at screening, the Court notes that "[p]olice officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." *Groman*, 547 F.3d at 633 (citing *Edwards v. City of Philadelphia*, 860 F.2d 568, 572 (3d Cir. 1988)). In other words, the use of force to effectuate an arrest must be reasonable. *Id.* (citing *Graham*, 490 U.S. at 396). The reasonableness of the officers' use of force is an objective inquiry that depends on the facts and circumstances of each particular case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (quoting *Carswell v. Borough of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004) (quoting *Graham*, 490 U.S. at 396)). Importantly, the "pointing of a weapon can amount to constitutionally excessive force, depending on the circumstances of application." *Davis v. Egg Harbor Township*, No. 14-4213, 2017 WL 2423053, at * 8 (D.N.J. June 5, 2017) (citing *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006)).

The facts alleged in Mesadieu's complaint, if true, suggest that Defendant Kelly's drawing of a gun on him was excessive under the circumstances. Again, Mesadieu indicates that he was acting in a cooperative manner after EPD officers pulled him over, and that he did not pose a threat

---

[9]  As noted above, because there are three named defendants whose last name is Kelly, it is unclear which "Defendant Kelly" Mesadieu is referring to.

to officers at that time, as evidenced by his specific factual allegation that his hands were raised as officers approached his vehicle. His Complaint is also bereft of any facts which suggest that it would have nonetheless been prudent for an officer to point his weapon at Mesadieu during that traffic stop. That said, although the foregoing facts plausibly suggest that "Defendant Kelly" may have committed a *prima facie* § 1983 excessive force violation for purposes of allowing this claim to proceed past screening, because Mesadieu's complaint identifies three different EPD officers whose surname is Kelly, it remains unclear which of the three specific Kelly defendants he is referring to. As a result, Mesadieu's pleading fails to sufficiently allege the requisite personal involvement of any one particular defendant needed to proceed this portion of his § 1983 excessive force claim. *Iqbal*, 129 S. Ct. at 1948; *Kornegey*, 299 F. Supp. 3d at 680. This portion of Mesadieu's § 1983 claim is accordingly dismissed without prejudice.

Conversely, the unidentified officers' banging on Mesadieu's car window and shouting of loud noises as they approached, without more, does not sufficiently support an actionable § 1983 excessive force claim. Moreover, even if that behavior somehow infringed on Mesadieu's Fourth Amendment rights, the Court would still dismiss this portion of his § 1983 claim at screening because Mesadieu fails to identify any specific defendants who are responsible for that conduct. *Iqbal*, 129 S. Ct. at 1948; *Kornegey*, 299 F. Supp. 3d at 680. Based on the foregoing considerations, Mesadieu's § 1983 excessive force claim is dismissed in its entirety, without prejudice, as against all defendants.

Mesadieu next claims that EPD officers, after removing him from the vehicle, performed "an illegal search" of both his person and the vehicle. He specifically alleges that he did not consent to the search. Mesadieu likewise implies, but does not explicitly claim, that this search occurred without EPD officers first obtaining a warrant. Critically, the facts alleged in his

pleading also make clear that EPD's search of Mesadieu's car and person on February 9, 2016 preceded his formal arrest on that date.

Generally, police officers must obtain warrants for searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). A well-recognized exception to the warrant requirement is a search incident to arrest: "a police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area 'within his immediate control.'" *Davis v. United States*, 564 U.S. 229, 232 (2011)). Thus, "in the case of a lawful custodial arrest[,] a full search of the person" does not violate the Fourth Amendment. *United States v. Robinson*, 414 U.S. 218, 235 (1973) "Officers may [likewise] conduct a warrantless search of a vehicle . . . in two instances: '(1) if the arrestee is within reaching distances of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains evidence relevant to the crime of arrest.'" *United States v. Brown*, 765 F.3d 278, 290 (3d Cir. 2014) (quoting *Davis*, 564 U.S. at 234-35).

Here, Mesadieu specifically claims that EPD Officer Jose Martinez searched his person without any legitimate basis to do so. While Martinez's version of events may ultimately differ markedly from Mesadieu's factual allegations, the Court must, at this stage, give credence to Mesadieu's claims that (1) there was no legitimate reason for otherwise unidentified BPD officers to stop his vehicle in the first instance; (2) Martinez searched Mesadieu's person without consent and without any other legally justifiable reason; (3) the search of Mesadieu and his vehicle did not lead to the discovery of any contraband; and (4) Mesadieu's subsequent arrest was based entirely on a fabricated gun charge, *i.e.*, that the search was not conducted incident to a "lawful arrest." Under this version of events, Martinez's search of Mesadieu's person on February 9, 2016 violated the Fourth Amendment. The Court will accordingly allow Mesadieu's § 1983 unlawful search claim to proceed as against Martinez. This claim will be dismissed without prejudice against all

other defendants because Mesadieu has not specifically identified any other individuals who were involved in the search of his person or vehicle on February 9, 2016. *Iqbal*, 129 S. Ct. at 1948; *Kornegey*, 299 F. Supp. 3d at 680.

Mesadieu additionally claims that he was the victim of an unlawful arrest. In order for this Fourth Amendment-based § 1983 claim to proceed, Mesadieu must allege (1) that there was an arrest; and (2) that the arrest was made without probable cause. *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988); *see also Albright v. Oliver*, 510 U.S. 266, 274 (1994) (a § 1983 claim for false arrest may be based upon an individual's Fourth Amendment right to be free from unreasonable seizures). Probable cause exists when the facts and circumstances are "sufficient to warrant a prudent man in believing that the defendant had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)); *accord Sharrar v. Felsing*, 128 F.3d 810, 817 (3d Cir. 1997). To establish the absence of probable cause, a plaintiff must show "that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinary prudent individual in believing that an offense had been committed." *Lind v. Schmid*, 67 N.J. 255, 262, 337 A.2d 365 (1975); *accord Watson v. Doe*, No. 04-962, 2005 WL 1116239, at *3 (D.N.J. May 10, 2005). Likewise, where police lack probable cause to make an arrest, as Mesadieu alleges in his Complaint, the arrestee has a Fourth Amendment-rooted § 1983 claim for false imprisonment based on the detention he is subjected to as a result of that arrest. *Groman*, 47 F.3d at 636; *Barna v. City of Perth Amboy*, 42 F.3d 809, 820 (3d Cir. 1994); *accord Watson*, 2005 WL 1116239 at *3.

In his complaint, Mesadieu specifically claims that he was formally arrested on February 9, 2016 *after* being taken to the IA office in EPD headquarters. He avers that while there, unidentified defendants admitted that they were framing him on a fabricated gun charge, and that

in spite of this knowledge, other unidentified officers formally arrested him. Mesadieu likewise alleges that he has remained subject to prolonged detention since that arrest in light of the foregoing falsified gun charges. While Mesadieu has alleged sufficient factual circumstances that would support *prima facie* § 1983 unlawful arrest and unlawful imprisonment claims, he has not identified any of the specific officers who formally arrested him nor has he identified the particular individuals who produced the purportedly fabricated evidence and reports related to his initial traffic stop and subsequent search of his vehicle and person that were utilized to justify his purportedly unlawful arrest and detention on February 9, 2016. Mesadieu's § 1983 unlawful arrest and unlawful detention claims are accordingly dismissed in their entirety without prejudice. *Iqbal*, 129 S. Ct. at 1948; *Kornegey*, 299 F. Supp. 3d at 680.

### d. Mesadieu's § 1983 conspiracy claim is dismissed

Mesadieu also brings a § 1983 conspiracy claim [10] against the otherwise unspecified defendants who purportedly conspired "to target, arrest, unlawfully seiz[e him], and falsify[] police report[s.]" (DE 1 at 27.) The Third Circuit – in its 2018 precedential decision, *Jutrowski v. Township of Riverdale*, 904 F.3d 280 (3d Cir. 2018) – recently outlined the contours of a viable conspiracy claim under 42 U.S.C. § 1983:

> To prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law "reached an understanding" to deprive him of his constitutional rights. *Adickes*

---

[10] "The [specific] elements of a claim of conspiracy to violate federal civil rights are as follows:

> (1) two or more persons conspire to deprive any person of constitutional rights; (2) one or more of the conspirators performs . . . any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or property or deprives the plaintiff of any right or privilege of a citizen of the United States, with the added gloss under § 1983 that the conspirators act under the color of state law."

*Jutrowski*, 904 F.3d at 294 n.15 (citing *Barnes Foundation v. Township of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001)) (internal quotations and bracketing omitted).

*v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 [] (1970). Such rights include, of course, those protected by the Due Process Clause of the Fourteenth Amendment, such as the "right to be heard in an impartial forum," *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 161 (3d Cir. 2010), and the "right of access to the courts," *Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008). Those rights "assure[] that no person will be denied the opportunity to present to the judiciary allegations concerning violations of . . . constitutional rights." *Wolff v. McDonnell*, 418 U.S. 539, 579 [] (1974).

. . . [T]he right of access to the courts . . . [is] denied when law enforcement officers conspire to cover up constitutional violations, *see*, *e.g.*, *Colbert[ v. City of Chicago*, 851 F.3d 649, 657-58 (7th Cir. 2017)] (holding that the plaintiff could allege under § 1983 that "the named officers participated in something akin to a 'conspiracy of silence among the officers' in which defendants refuse to disclose which of their number has injured the plaintiff"). A "conspiracy of silence" among officers is actionable as a § 1983 conspiracy because the coordinated officer conduct "impede[s] an individual's access to courts" and renders "hollow" a victim's right to redress in a court of law. *Vasquez v. Hernandez*, 60 F.3d 325, 328-29 (7th Cir. 1995) ("[W]hen police officers conceal or obscure important facts about a crime from its victims rendering hollow the right to seek redress, constitutional rights are undoubtedly abridged."); *see also Swiggett v. Upper Merion Township*, No. 08-2604, 2008 WL 4916039, at *4 (E.D. Pa. Nov. 17, 2008) ("[C]ourts have found that concealing a constitutional violation, including use of excessive force, does not amount to a separate constitutional violation unless the victim of the concealment was deprived of his right of access to the courts.").

After a plaintiff establishes that the object of the conspiracy was the deprivation of a federally protected right, "the rule is clear that" the plaintiff "must provide some factual basis to support the existence of the elements of a conspiracy: agreement and concerted action." *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 184-85 (3d Cir. 2009) (citing *Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990)). To show agreement, he must demonstrate that "the state actors named as defendants in the[] complaint somehow reached an understanding to deny [the plaintiff] his rights," *Kost v. Kozakiewicz*, 1 F.3d 176, 185 (3d Cir. 1993) . . . .

*Jutrowski*, 904 F.3d at 293-95.

In his Complaint, Mesadieu alleges that all of the "officer defendants" were involved in a

sweeping conspiracy "to target, arrest, unlawfully seiz[e], and falsify[] police report[s] against [him] based on corruption [and that these actions] constituted selective enforcement of the law and denial of equal protection [and due process] in violation of the Fourteenth Amend[ment.]"   (DE 1 at 27.)   Mesadieu also expressly avers that substantially all of the defendants identified in his Complaint engaged in a concerted effort to prevent him from obtaining critical exculpatory evidence needed to exonerate him of the gun charges he is currently imprisoned for, thereby depriving him his constitutional right of access to the Courts.   (*Id.*)   These conclusory allegations fail to support a viable § 1983 civil conspiracy claim.

First, Mesadieu's pleading fails to specify which named defendants were involved in any particular aspect of this sweeping conspiracy.   His pleading likewise lacks any particularized factual allegations that clearly identify the specific individuals who had direct, personal involvement in the alleged conspiratorial actions Mesadieu complains of.   *Shaw by Strain*, 920 F.2d at 1147 ("Only those defendants whose inactions or actions personally caused [Plaintiff's] injury may be held liable under § 1983."); *Kornegey*, 299 F. Supp. 3d at 680 & n.17 (personal involvement can be shown through allegations, made with "appropriate particularity," of personal direction or of actual knowledge and acquiescence).

Mesadieu's Complaint likewise fails to contain any specific factual matter that plausibly suggests that the defendants' purportedly conspiratorial actions, even if true, were done pursuant to an agreement amongst them to deny Mesadieu of his constitutional rights.   In that respect, there is no specific information in his complaint which, *inter alia*, credibly suggests that Mesadieu's ability to pursue relief in a judicial forum has been impeded by the fabricated evidence and falsified reports generated by otherwise unspecified defendants; this remains true notwithstanding that the officers' actions during their February 9, 2016 stop, search, arrest, and detention of Mesadieu

would, under the circumstances alleged in his complaint, likely violate the Fourth Amendment. Indeed, "concealing a constitutional violation, including [a Fourth Amendment violation], does not amount to a separate constitutional violation unless the victim of the concealment was deprived of his right of access to the courts." *Jutrowski*, 904 F.3d at 294-95 (quoting *Swiggett*, 2008 WL 4916039, at *4). In short, Mesadieu's sweeping allegations of a broad conspiracy that existed between all defendants lacks the necessary particularity for this claim to proceed further. Based on the foregoing considerations, the Court will dismiss Mesadieu's § 1983 conspiracy claim without prejudice.

### e. Mesadieu's Equal Protection Clause-based § 1983 claims are dismissed

Mesadieu's pleading makes clear that he believes otherwise unspecified defendants singled him out for arrest and fabricated evidence against him because he refused to become a CI. (*See* DE 1 at 16). He also specifically claims that these "officer defendants . . . , in targeting [Mesadieu] based on corruption, denied him equal protection of the law, in violation of the . . Fourteenth Amendment." (DE 1 at 25.) He further asserts that the officer defendants, "in writing falsified traffic citations and police report[s] base[d] on corruption constituted selective enforcement of law in violation of the Fourteenth Amendment." (*Id.*) Mesadieu therefore appears to be under the impression that the defendants' selective actions against him violated his Fourteenth Amendment rights to "equal protection of the laws." U.S. Const. amend. XIV, § 1.

For this § 1983 selective enforcement claim to proceed past screening, Mesadieu must plead sufficient facts demonstrating that (1) similarly situated suspects of a different race were not subject to the same treatment; and (2) that the defendants' actions in targeting the plaintiff, were at least partially motivated by his race. *White v. Williams*, 179 F. Supp. 2d 405, 418 n.5 (D.N.J. 2002) (citing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)); *see also Renchenski v.*

*Williams*, 622 F.3d 315, 337 (3d Cir. 2010) (to prevail on § 1983 equal protection claim, a plaintiff must demonstrate that defendants "treated him differently because he is a member of a suspect class or because he exercised a fundamental right."). Here, Mesadieu's pleading contains no indication that defendants' elective actions against him were racially motivated or based on otherwise constitutionally impermissible considerations; he instead avers that he was singled out because he refused to become a CI. Mesadieu's § 1983 Equal Protection Clause-rooted claims are accordingly dismissed without prejudice for failure to state a claim.

### f. Mesadieu's § 1985(3) and § 1986 claims are dismissed

Mesadieu, in addition to claiming that the defendants' alleged conspiratorial acts are actionable under § 1983, also asserts claims against defendants under two other related civil conspiracy statutes, 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986. (DE 1 at 26-27.) Section 1985(3)[11] permits a party to bring an action to recover for injuries incurred by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." *Id.* To establish a claim for civil conspiracy under 42 U.S.C. § 1985(3), a plaintiff must allege the following:

> (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or

---

[11] 42 U.S.C. § 1985(3) specifically provides that:

> If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (citations omitted). Importantly, for Mesaidieu's § 1985(3) claim to proceed further, "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin v. Breckenridge*, 403 U.S. 88, 102, (1971).

Section 1986[12] "constitutes an additional safeguard for those rights protected under § 1985, and 'transgressions of § 1986 by definition depend on a preexisting violation of § 1985[.]'" *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994) (quoting *Rogin v. Bensalem Township*, 616 F.2d 680, 696 (3d Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981)). Stated more simply, "to maintain a cause of action under § 1986, [a plaintiff] must [first] show the existence of a § 1985 conspiracy."[13] *Id.* at 1296 n.5.

Here, Mesadieu has not alleged that defendants' purported conspiratorial actions were motivated by racial or class based discriminatory animus. As such, Mesadieu's Complaint fails

---

[12] 42 U.S.C. § 1986 specifically provides that:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in [§ 1985], are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case[.]

[13] In addition, a § 1986 plaintiff must demonstrate that "(1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." *Clark*, 20 F.3d at 1295-96 (citations omitted).

to state a *prima facie* claim under § 1985(3). *Kornegey*, 299 F. Supp. 3d at 685 (plaintiff failed to state a § 1985 claim where his pleading failed to allege that defendant "engaged in any conduct evidencing animus or discrimination based on race or ethnicity, or of disparate treatment based on these classifications."); *see also Robinson v. McCorkle*, 462 F.2d 111, 113 (3d Cir. 1972) ("With near unanimity, the courts have rejected complaints containing mere conclusory allegations of deprivations of constitutional rights under § 1985(3)"). Mesadieu has accordingly also failed to state a *prima facie* § 1986 claim. *Clark*, 20 F.3d at 1295. The Court will therefore dismiss Mesadieu's § 1985(3) and § 1986 civil conspiracy claims without prejudice.

### g. All of Mesadieu's § 1983 supervisory liability-based claims and *Monell* claims are dismissed

Mesadieu also asserts § 1983 claims against Union County, Elizabeth, EPD Chief Shannon, Prosecutor Park, and AAG Borstein in their purported roles as EPD supervisors. He avers, in sweeping fashion, that all of these defendants "are under a duty to supervise the members of the [EPD] and to ensure that the policing activities of the [EPD] are run in a lawful manner" and that they "permitted, encouraged, tolerated, and knowingly acquiesced to an official pattern, practice, or custom of police officers, and prosecutors, including but not limited to defendants, of violating [Mesadieu's] rights based on corruptions." (DE 1 at 20-21.) He further claims that "[t]hese defendants failed to train and properly supervise police officers regarding proper arrest procedures and techniques." (*Id.* at 22.) Mesadieu also asserts that these five defendants are all responsible for "policies or customs of inadequate training, supervision, discipline, screening, or hiring." (*Id.* at 22.) He claims that the above-named defendants' failure to properly supervise defendants has resulted in a "well settled and permanent policy" in which prosecutors and police officers are allowed to "wrongfully arrest individuals" and to "forc[e] them to become [CIs]." (*Id.* at 21.) He similarly alludes to these defendants' acquiescence to a "code of silence" that has enabled these

purported actions to continue unchecked. For the reasons detailed below, all of Mesadieu's § 1983 supervisory liability-related claims will be dismissed.

Mesadieu's § 1983 claims against Union County and the City of Elizabeth appear to arise under two distinct, albeit closely-related, legal theories of municipal liability: (1) that these municipal entities are the driving force behind the policies and customs[14] within the EPD and the Union County Prosecutor's Office – including the "code of silence" – that enabled the defendants to violate his constitutional rights; and (2) that these defendants failed to properly train and supervise their employees (the "*Monell* claims"). Union County and Elizabeth, both of whom are municipal entities, "may not be held liable for constitutional torts under § 1983 on a vicarious liability theory rooted in *respondeat superior*. *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990). Instead, these defendants' liability under § 1983 is limited "to only those constitutional torts actually caused by the municipality." *Beck v. City of Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996). Accordingly, municipal defendants may be subject to § 1983 liability "when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Id.* at 971 (citing *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978)). Stated more simply, Union County and City of Elizabeth can be "held responsible as an entity [under § 1983] when the injury inflicted is permitted under its adopted policy or custom." *Id.*

For Mesadieu to prevail on this claim, he "must show that [he was] deprived of rights,

---

[14] Policy is made when a decisionmaker, *i.e.*, one who has final authority to establish the relevant municipal policy, issues an official proclamation, policy, or edict; a course of conduct is considered to be a custom when, although not authorized by law, its practice by state officials is so permanent and well-settled as to virtually constitute law. *Andrews*, 895 F.2d at 1480. An unofficial custom" may also be established by evidence of knowledge and acquiescence." *Beck*, 89 F.3d at 971.

privileges, or immunities secured by the Constitution and laws, and that the deprivation of those rights was the result of an official government policy or custom." *Mulholland v. Gov't County of Berks, Pennsylvania*, 706 F.3d 227, 237-38 (3d Cir. 2013) (citations and internal quotations omitted). In other words, Union County and Elizabeth "may be held liable [under this theory of municipal liability] only if [that entity's] policy or custom is the 'moving force' behind a constitutional violation." *Sanford v. Stiles*, 456 F.3d 298, 314 (3d Cir. 2006) (citing *Monell*, 436 U.S. at 691). In sum, this claim may proceed only if Mesadieu's complaint contains factual allegations which plausibly suggest that either Elizabeth or Union County (1) adopted an official policy or unofficial custom that deprived Mesadieu of his constitutional rights; (2) acted deliberately and was the moving force behind the deprivation; and (3) Mesadieu's injuries were caused by the identified policy or custom. *Monell*, 436 U.S. at 692-94.

Mesadieu's § 1983 failure to train claim against Union County and Elizabeth is subject to similar scrutiny. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 405 (1997) ("[R]igorous standards of culpability and causation must be applied to [failure to train claims to] ensure that the municipality is not held liable solely for the actions of its employee."). This claim is subject to a "stringent" standard, "requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County*, 520 U.S. at 410; *accord Doe v. Luzerne County*, 660 F.3d 169, 179 (3d Cir. 2011) ("[A] municipality can only be liable under § 1983 where the failure to train demonstrates a 'deliberate' or 'conscious' choice by the municipality.") (citations omitted).

Such a claim normally requires a "pattern of similar constitutional violations by untrained employees." *Thomas v. Cumberland County*, 749 F.3d 217, 223 (3d Cir. 2014) (citation omitted). As the Third Circuit has explained:

> To determine whether a municipality's alleged failure to train its employees amounted to a deliberate or conscious choice, it must be shown that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."

*Doe*, 660 F.3d at 179-80 (citing *Carter v. City of Philadelphia,* 181 F.3d 339, 357 (3d Cir. 1999). Moreover, "the identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) (internal quotations and citations omitted).

Mesadieu's pleading contains only the conclusory, oft-repeated assertion that Union County and the Elizabeth permitted, encouraged, tolerated, and knowingly acquiesced to a culture at EPD and the Prosecutor's Office that enabled the defendants to wrongfully arrest him. His complaint lacks any particularized factual allegations which plausibly suggest that the unconstitutional acts allegedly committed by the police officers and attorneys employed by those entities are attributable to an official policy or an custom promogulated by Union County and/or Elizabeth. *Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425, 441 (E.D. Pa. 2015) ("[C]onclusory statements, without more, fail to adequately allege that [a municipality] adopted a policy, custom, or practice that resulted in a violation of [plaintiff's] rights.").

Mesadieu's pleading is likewise bereft of specific facts demonstrating that the alleged constitutional violations committed by the individual defendants in the course of stopping, searching, arresting, and detaining Mesadieu on February 9, 2016 was the result of Union County

and/or Elizabeth's failure to train and/or educate their respective personnel. *Tarbox v. Butler Township*, No. 14–1346, 2015 WL 6157173, at *10 (M.D. Pa. Oct. 19, 2015) (conclusory allegations regarding township's failure to train and/or educate police officers are insufficient to invoke *Monell* liability). In short, there are no factual allegations in Mesadieu's pleading which plausibly suggest that an official policy of Union County or Elizabeth – related to employee training or otherwise – or an unofficial, municipality-specific custom was the "moving force" behind the alleged constitutional violations committed against him on February 9, 2016.

Furthermore, Mesadieu fails to allege facts that sufficiently suggest that Union County and/or Elizabeth implemented any such policy or custom with constitutionally actionable deliberate indifference. Mesadieu's pleading, among other things, fails to describe or detail any incidents in which other persons were subject to the same treatment he endured and likewise fails to describe when and how, if at all, any such incidents were reported to either municipal defendant. His blanket reference about other incidents of misconduct is "not sufficient to create a pattern of violations[.]" *Buoniconti*, 148 F. Supp. 3d at 443 (citing *Thomas*, 749 F.3d at 225). The Court will accordingly dismiss without prejudice Mesadieu's *Monell* claims against Union County and the City of Elizabeth for failure to state a claim.

Mesadieu has also asserted § 1983 claims against EPD Chief Shannon, Prosecutor Park, and AAG Bornstein in their roles as supervisors of EPD personnel. There are two avenues under which these defendants may be subject to § 1983 supervisory liability:

> First, like municipalities, "[i]ndividuals who are policymakers may be liable under § 1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm.'" Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates'

violations."

*Cannon v. City and County of Philadelphia*, No. 14-5388, 2014 WL 7399037, at *3 (E.D. Pa. Dec. 30, 2014) (internal citations omitted).   The elements for supervisory liability are "met where the supervisor 'failed to respond appropriately in the face of an awareness of a pattern of such injuries' or where 'the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support' a finding of deliberate indifference."   *Parkell v. Markell*, 622 F. App'x 136, 140 (3d Cir. 2015) (quoting *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989)).

Mesaidieu fails to sufficiently plead a § 1983 supervisory liability claim against Shannon, Park, or Bornstein.   First, he has not alleged facts which plausibly suggest that these specific defendants (or any defendant), with deliberate indifference, established and maintained any policy or custom that directly caused a constitutional harm.   *See Cannon*, 2014 WL 7399037, at *3. Second, Mesadieu has not alleged facts that allow the Court to plausibly infer that Shannon, Park, or Bornstein participated in a violation of his rights, directed others to violate them, or acquiesced to a violation.   *See id.*   Moreover, there are no well-pleaded factual allegations to support an inference that these defendants "failed to respond appropriately in the face of an awareness of a pattern of such injuries."   *Parkell*, 622 F. App'x at 140, 2015 WL 4523521, at *3.   Again, Mesadieu's conclusory reference to "a number of [prior] complaints" (*see* DE 1 at 18), without more, does not establish a pattern.

In sum, because Mesadieu's complaint contains "no specific factual allegations fleshing out the claims of supervisory liability," *Wood v. Williams*, 568 F. App'x 100, 107 (3d Cir. 2014), the Court will dismiss his § 1983 supervisory-related claims against Shannon, Park, and Bornstein. *See also Cannon*, 2014 WL 7399037, at *5 (allegations that "the supervisors approved of or failed

to stop what the supervisees actually did" are "mere restatements of the element of supervisory liability claims"); *Santiago v. Warminster Tp.*, 629 F.3d 121, 131 (3d. Cir. 2010) (same).

### h. All of Mesadieu's state law claims are dismissed without prejudice

Mesadieu also asserts state law tort claims against various public entity and employee defendants for (1) assault, (2) wrongful imprisonment, (3) corrupt misconduct, (4) intentional infliction of emotional distress, and (5) negligence. (DE 1 at 28-29.) All of these claims are governed by the New Jersey Tort Claims Act ("NJTCA"), N.J.S.A. 59:1-1 *et seq. See Ingram v. Township of Deptford*, 858 F. Supp. 2d 386, 400 (D.N.J. 2012) (citing, *inter alia*, *Velez v. City of Jersey City*, 180 N.J. 284 (2004); *Longo v. Santoro*, 195 N.J. Super. 507, 514 (App. Div. 1984)).

Under the NJTCA, a notice of claim must, as a general matter, be filed with the appropriate public entity defendant not later than the ninetieth day after accrual of the underlying cause of action. N.J.S.A. § 59:8-8. The NJTCA further requires that the filing of the notice is a prerequisite to bringing a tort claim against a public entity or employee in a "court of law." *See id.* "(After the expiration of six months from the date notice of claim is received, the claimant may file suit in an appropriate court of law."); *see also id.* at § 59:8-3 ("No action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter."). Thus, a plaintiff's failure to file the required pre-suit notice will result in the dismissal of his tort claims. *Ingram*, 858 F. Supp. 2d at 400.

Here, Mesadieu's pleading does not indicate that he filed any such pre-suit notices required by the NJTCA. The Court will accordingly dismiss all of his state law tort claims – which again, are exclusively asserted against public entities and employees – based on Mesadieu's failure to plead facts which suggest that he complied with the NJTCA's notice requirement prior to bringing

the above-listed tort claims in the present lawsuit.  *See id.* ("The Plaintiff's complaint does not allege that she filed notice in accordance with the statute. Therefore, the Plaintiff's complaint fails to state a claim for negligence and assault and battery and must be dismissed.").  Dismissal of these claims is without prejudice.

## V.    CONCLUSION

For the reasons set forth above, Mesadieu's § 1983 unlawful search claim against EPD Officer Jose Martinez may proceed.  Mesadieu's 42 U.S.C. § 1985(1) and 42 U.S.C. § 1985(2) civil conspiracy claims are dismissed with prejudice.   Any and all such federal civil rights claims which Mesadieu asserts against the Elizabeth Police Department are also dismissed with prejudice. "With prejudice" means that Mesadieu cannot brings those claims again.  All other claims in Mesadieu's pleading are dismissed without prejudice as against all other named defendants. Mesadieu is provided forty-five (45) days to file an amended complaint as to those claims dismissed without prejudice.[15]   If he fails to do so, then those claims will also be dismissed with prejudice.   An appropriate Order accompanies this Opinion.


Date: October 4, 2019                                         s/ John Michael Vazquez
                                                             JOHN MICHAEL VAZQUEZ
                                                             United States District Judge

---

[15]   An amended complaint is filed, it supersedes the original and renders the first complaint of no legal effect, unless the amended complaint specifically refers to or adopts the earlier pleading. *See West Run Student Housing Associates, LLC v. Huntington National Bank,* 712 F.3d 165, 171 (3d Cir. 2013)(collecting cases); *see also* 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1476 (3d ed. 2008).   To avoid confusion, the safer practice is to submit an amended complaint that is complete in itself.   Wright & Miller, *supra*, at § 1476.